IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
April 19, 2016 Session

**STATE OF TENNESSEE v. GRACE ANN BLAIR**

**Appeal from the Circuit Court for Montgomery County**
**No. 41400766      John H. Gasaway, III, Judge**
_____

**No. M2015-01231-CCA-R3-CD – Filed November 16, 2016**
_____

The Defendant, Grace Ann Blair, was charged in a two-count indictment with driving under the influence ("DUI") and DUI per se, Class A misdemeanors. *See* T.C.A. § 55-10-401(1), (2). She moved to dismiss the charges after discovering that her blood sample was destroyed a little over one year after her arrest. The trial court granted the dismissal, finding that the sample contained potentially exculpatory evidence which could have shown that the Defendant's actions were involuntarily undertaken while she was under the influence of Ambien. The State appeals. Because we have determined that the Defendant's due process rights were not violated by the destruction of the sample, we reverse the dismissal of the charges and remand for further proceedings consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed;
Case Remanded**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Glenn Funk, District Attorney General; and Karen Willis, Assistant District Attorney General, for the appellant, State of Tennessee.

Margaret E. Garner, Maitland, Florida, for the appellee, Grace Ann Blair.

**OPINION**

The facts surrounding the Defendant's arrest were introduced by agreement of the parties in the form of the police reports summarizing her encounter with law

enforcement. Acting on "complaints from private citizens … to 911" and on the observation of officers, law enforcement stopped the Defendant's vehicle around 10:30 p.m. on September 14, 2013. The Defendant brought her vehicle to a stop, and then she began to reverse toward the patrol car. The Defendant attempted to exit the vehicle while it was in motion, was almost run over by her own vehicle, then re-entered the car and brought it to a final stop. The Defendant was swaying and unsteady when she exited the vehicle, and she had "droopy eyelids." The Defendant did not perform satisfactorily on several field sobriety tests, was arrested, and consented to a blood test.

Special Agent Jeff Crews of the Tennessee Bureau of Investigation ("TBI") testified regarding the testing and storage of the Defendant's blood sample. Special Agent Crews stated that he was responsible for the standard operating procedures of the toxicology department. He identified a manual which noted that "[b]iological evidence routinely will be destroyed after testing. This evidence will be held for a minimum of 60 days from the date of the final report. Actual destruction dates may be longer than 60 days, depending upon the storage capacity of the laboratory." Special Agent Crews testified that samples were usually held for up to a year, depending on the facility's storage capacity. He testified that storage capacity is limited, that the agency receives two thousand samples per month, and that blood can degrade over time. He also noted that the policy stated that evidence would only be preserved or released on request from the submitting agency or district attorney, or pursuant to a court order. Another internal TBI policy document stated that "[b]ecause of the increasing problems involving the space and manpower used to indefinitely store certain toxicology samples," the TBI would require a court order to retain samples and that the order would only be valid for six months from the date it was issued. He acknowledged that these were internal policies and agreed that "someone would have to know that this policy existed and specifically request that it be produced in order to obtain it."

As part of the "Alcohol/Toxicology Request" form submitted to the TBI by Deputy Cody Lannom, Deputy Lannom asked for a screening of the Defendant's blood for alcohol and Ambien. Special Agent Crews testified that the department's policy mandated that if the sample had a blood alcohol content ("BAC") of 0.08 percent or higher, no further testing would be done, even if the presence of another drug was suspected. The form which Deputy Lannom filled out included a statement of the TBI's policy that no further testing would be conducted if the BAC was above the legal limit. Agent Crews confirmed that while the agents of the State had access to this form, it was not, to his knowledge, supplied to the Defendant or her counsel.

Special Agent Crews identified the Official Alcohol Report summarizing the analysis conducted on the Defendant's blood. This report was issued on November 18, 2013, and contained the notation: "Evidence will be destroyed after 60 days." The

-2-

Defendant's BAC was 0.17 percent, and the requested test for Ambien was not conducted.

The parties stipulated that the Defendant appeared in General Sessions court on January 23, 2014, and that on that date, defense counsel received a copy of the lab report regarding the Defendant's BAC, which stated the sample would be "destroyed in 60 days."[1] The Defendant was indicted July 8, 2014. The trial court found that the Defendant received discovery in August or September 2014 and that the discovery documents clarified that the blood had not and would not be tested further to determine the presence of other substances.

Special Agent Crews testified that internal documents showed that the Defendant's blood sample was destroyed on November 3, 2014.

On December 11, 2014, the Defendant filed a motion asking the court to find her indigent for the purpose of obtaining funds for expert testimony. On December 17, 2014, she moved the court to compel the TBI to conduct drug testing on the blood sample. On April 24, 2015, the Defendant moved to dismiss the charges based on the destruction of the sample.

The parties agreed at the hearing to enter into evidence two letter reports prepared by the Defendant's expert witness, Dr. Jonathan Lipman. Dr. Lipman, a neuropharmacologist, recounted in a letter written March 4, 2015, the facts regarding the Defendant's arrest, including that she had consumed "three or four 'tequila-based' beverages" between 5:00 and 9:00 p.m.,[2] that she took her prescription Ambien with the intention of going to straight to bed, and that she had no memory of her decision to drive or her subsequent arrest. He stated that it was possible for Ambien to cause amnesia and automatistic behavior either when combined with alcohol or when taken in excess. He stated that the medication could be taken in excess either intentionally or as a result of the patient having forgotten, due to the medicine's amnesic effect, that the medication had already been taken. Dr. Lipman summarized scientific literature regarding the effects of the drug and cited several anecdotal cases of automatisms. He also noted that the

---

[1] The transcript contains a stipulation that the Defendant appeared in General Sessions Court on January 23, 2014. There is nothing in the transcript stipulating the date the report from the TBI was provided to the defense. However, defense counsel drafted the trial court's order, which found that the parties stipulated that the report was given to the Defendant on February 27, 2014. In her brief, the Defendant acknowledges that it is undisputed that the report "was provided to counsel for [the Defendant] for the first time at the January 23, 2014 general sessions trial date."

[2] The Defendant's motion to dismiss also states that the Defendant would testify to consuming alcohol as described above.

labeling of the drug had been changed to warn patients "of the risk of taking higher doses than prescribed or of combining [Ambien with] … alcohol." Dr. Lipman stated that investigating a claim of automatism would require witness interviews, "laboratory measurement of the zolpidem concentration in blood," and laboratory quantification of additional intoxicants.

Dr. Lipman followed up with a second letter dated March 20, 2015, which stated that Ambien could have caused the Defendant to suffered from automatism and amnesia surrounding events such as consuming additional alcohol, consuming another drug, or driving a car. He stated that toxicological analysis could have determined whether she had taken Ambien and that the destruction of the sample made it impossible to "determine and quantify" the presence of Ambien. He concluded that "[f]or this reason I am unable to form an opinion as to whether Ambien caused any involuntary behavior which would potentially support an involuntary intoxication defense, and any testimony I could provide would be limited to describing what effects Ambien can have, if in fact it had been taken."

The trial court dismissed the indictment, concluding that the State's failure to preserve the sample had irremediably prejudiced the defense. The trial court found that the State had a duty to preserve the evidence, that it had knowledge that the evidence might potentially be exculpatory, and that there was no other available source for the evidence. The trial court further found that the evidence was destroyed through the State's intentional acts, although the State did not act in bad faith. The trial court credited the statement of Dr. Lipman that laboratory measurement of the concentration of Ambien was necessary to determine automatism. The trial court concluded that the destruction of the evidence deprived the Defendant of her defense both for the DUI and the DUI per se charge. After determining that a trial would be fundamentally unfair, the trial court dismissed the charges.

The judgment form showing that the charges were dismissed was filed on the day of the hearing, May 12, 2015, and the trial court's written findings were entered on June 4, 2015. The written findings were drafted by defense counsel and entered with a notation "Nunc Pro Tunc to May 12, 2015." The State filed a notice of appeal on June 25, 2015.

## ANALYSIS

### I. Notice of Appeal

Initially, the Defendant argues that the State's notice of appeal was not timely filed and that the appeal should be dismissed. A notice of appeal must be filed within thirty

days of the entry of the judgment which is appealed. Tenn. R. App. P. 4(a). This court may waive a timely notice of appeal in the interest of justice. Tenn. R. App. P. 4(a). Waiver of the notice requirement is not automatic, and this court bears in mind that reflexively granting waiver would render the timely notice requirement a "legal fiction." *State v. Rockwell*, 280 S.W.3d 212, 214 (Tenn. Crim. App. 2007). "In determining whether waiver is appropriate, this court will consider the nature of the issues presented for review, the reasons for and the length of the delay in seeking relief, and any other relevant factors presented in the particular case." *Id.* at 214 (quoting *State v. Markettus L. Broyld,* No. M2005-00299-CCA-R3-CO, 2005 WL 3543415, at *1 (Tenn. Crim. App. Dec. 27, 2005)).

In this case, the State argued that the trial court, in the transcript, directed defense counsel to draft the order and that the trial court's oral request creates a conflict between the transcript and judgment document. The State asserts that the notice is timely and alternatively requests that we waive the notice requirement. The uniform judgment document appears to have been properly filed by the court clerk, and the State concedes that the prosecutor filed the document. The order, filed on June 4, 2015, included a notation purporting to backdate it to May 12, 2015. We conclude that the entry of the judgment began the time to file the notice of appeal, and the notice is not timely. *See State v. Vaughn*, 279 S.W.3d 584, 593 (Tenn. Crim. App. 2008) (noting that the effective date for the entry of a judgment is the date it is filed with the court clerk after having been signed by the trial judge). We opt to waive the timeliness of the notice of appeal in the interest of justice, and we proceed to address the dismissal of the charges.

## II. Dismissal Pursuant to *Ferguson*

The State contends that the trial court erred in dismissing the indictment after finding that a trial in the absence of the destroyed evidence would be fundamentally unfair and would violate the Defendant's right to due process. *See State v. Ferguson*, 2 S.W.3d 912 (Tenn. 1999). A trial court's decision to dismiss an indictment based on a determination that the State's destruction of evidence has violated the defendant's due process rights is reviewed de novo. *State v. Merriman*, 410 S.W.3d 779, 790 (Tenn. 2013). The trial court's findings of fact in determining the violation are conclusive on appeal unless the evidence preponderates otherwise. *Id.* at 791. If this court concludes upon its de novo review that there was a due process violation, then we review the trial court's choice of remedy under an abuse of discretion standard. *Id.* A trial court abuses its discretion by applying an incorrect legal standard or reaching a decision that is against logic or reasoning and that causes an injustice to the complaining party. *State v. Gilliland*, 22 S.W.3d 266, 270 (Tenn. 2000).

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution guarantee the right to a fair trial. When the State's actions result in the loss or destruction of potentially exculpatory evidence, the court must determine whether a trial conducted without that evidence would be fundamentally fair. *Ferguson*, 2 S.W.3d at 914. The Tennessee Supreme Court has determined that the defendant need not prove bad faith on the part of the State in order to be entitled to due process relief. *Id.* at 916-17.

As a preliminary step in evaluating the fundamental fairness of a trial held without the lost or destroyed evidence, the court must determine whether the State had a duty to preserve the evidence. *Id.* at 917. The State generally has a duty to preserve evidence subject to discovery under Tennessee Rule of Criminal Procedure 16 or other law. *Id.* While the State may have a statutory duty to preserve evidence discoverable under Tennessee Rule of Criminal Procedure 16, the contours of a constitutional duty to preserve evidence

> must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

*Ferguson*, 2 S.W.3d at 917 (quoting *California v. Trombetta,* 467 U.S. 479, 488-89 (1984)).

If the court finds that the State had a duty to preserve the destroyed evidence, then the court evaluates (1) the degree of negligence involved; (2) the significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and (3) the sufficiency of other evidence. *Ferguson*, 2 S.W.3d at 917. A pretrial *Ferguson* inquiry requires the court to "assess the sufficiency of the State's evidence while being mindful that this assessment is not the equivalent of determining the defendant's guilt or innocence beyond a reasonable doubt." *Merriman*, 410 S.W.3d at 789-90. The court evaluates these three factors to determine whether the breach of the duty to preserve the evidence would result in a trial that is fundamentally unfair. *Ferguson*, 2 S.W.3d at 917. If the court finds that the trial would be fundamentally unfair, then it can dismiss the charges or craft another appropriate remedy, such as instructions creating a presumption favorable to the defendant. *Id.* at 917 & n.11.

The exculpatory value of the lost or destroyed evidence "has considerable significance in resolving" the issue of the State's duty to preserve it. *Id.* at 918. Evidence need not be clearly exculpatory; even evidence which has "tenuous" exculpatory value and which is "probably of marginal exculpatory value" may give rise to a duty to preserve, so long as it was material to the preparation of the defense and might have given rise to reasonable doubt regarding guilt. *Id.* Accordingly, the evidence need not be apparently exculpatory but only "'potentially' exculpatory evidence." *Merriman*, 410 S.W.3d at 785 n.3 & 792 (concluding that evidence which could have been beneficial to the defense or the State was potentially exculpatory). The Tennessee Supreme Court has recognized "the difficulty in defining the boundaries of the State's duty to preserve evidence when its true nature, whether exculpatory, inculpatory, or neutral, can never be determined." *Id.* at 785.

To give rise to a duty to preserve, the blood sample must have had "potential exculpatory value and be of such a nature that [the Defendant] would be unable to obtain comparable evidence by other reasonably available means." *Id.* at 792. The Defendant argues that the blood had potentially exculpatory value because it could have shown that she was under the influence of prescription Ambien, which could cause automatism or involuntary behavior and amnesia. Her theory is that the presence of the drug in her system would tend to show that she did not undertake the act of driving voluntarily. The State argues that it had no duty to preserve the blood.

In evaluating the availability of comparable evidence, we note that the sample demonstrating the presence of Ambien in the Defendant's blood was unique. The fact that the Defendant took prescription Ambien on the night of the offense, however, could be established by other evidence, including the Defendant's statement to law enforcement, her own testimony, or medical records. In *State v. Michael Orlando Freeman*, the defendant claimed that he was entitled to relief because of the loss of a cellular telephone that he believed could have shown that there was extensive contact with the victim, contrary to her testimony. *State v. Michael Orlando Freeman*, No. E2014-02054-CCA-R3-CD, 2016 WL 912160, at *14 (Tenn. Crim. App. Mar. 10, 2016) *no perm. app. filed*. Defense counsel was appointed in July 2012 but did not attempt to obtain the telephone itself or the records from the provider until November 2012, after the telephone had been returned to the victim. *Id.* Neither did the defendant attempt to retrieve the information from his own telephone, which he had lost. *Id.* This court stated:

> We find it dubious that the Defendant should fault the State for failing to preserve evidence which he himself also failed to safeguard. The timing of the Defendant's motions and his failure to follow-up with the trial court's directives after the hearing on the motion to dismiss show that he was less

-7-

than diligent in his attempts to procure the desired evidence. We caution that *Ferguson* does not discharge a defendant's obligation to conduct expedient investigations and to secure relevant, material evidence whenever possible.

*Id.* at \*14. Here, the Defendant was aware in January 2014 that the perishable sample was scheduled for destruction; nevertheless, she did not attempt to preserve or test the blood until December 2014. While the sample was unique, the Defendant remained under an "obligation to conduct expedient investigations and to secure relevant, material evidence whenever possible." *Id.* at \*14.

We observe that the blood sample was discoverable under Tennessee Rule of Criminal Procedure 16(a)(1)(F). *See State v. Margaret Laverne Riddle*, No. E2014-01037-CCA-R3-CD, 2015 WL 9487936, at \*11 (Tenn. Crim. App. Dec. 29, 2015), *perm. app. denied* (Tenn. May 5, 2016) (noting that a blood sample is discoverable under Rule 16 and that the State has a general duty to preserve discoverable evidence). Accordingly, the evidence was subject to discovery and the State had a statutory duty to preserve it. *See Ferguson*, 2 S.W.3d at 917. However, a constitutional duty to preserve the sample will only arise if it possessed exculpatory value that was apparent before it was destroyed.

The duty to preserve evidence "does not extend to that which the State cannot preserve." *State v. Tony Best*, No. E2007-00296-CCA-R3-CD, 2008 WL 4367529, at \*14 (Tenn. Crim. App. Sept. 25, 2008). While the State is generally under a duty to preserve discoverable evidence, there is no obligation to preserve evidence that is hazardous to preserve. *Id.* at \*14-15 (concluding that the State was not under a duty to preserve dangerous chemicals used to manufacture methamphetamine); *see also State v. Ernest Dodd*, No. M2011-02259-CCA-R3-CD, 2013 WL 2296168, at \*5 (Tenn. Crim. App. May 23, 2013) (same). Accordingly, the State has no duty to preserve evidence when its preservation is not possible. *State v. Donald Terry Moore*, No. 01C01-9702-CR-00061, 1998 WL 209046, at \*9-10 (Tenn. Crim. App. Apr. 9, 1998) (concluding that the State had no duty to preserve semen sample that was entirely used in attempting to obtain a DNA profile).

The State cites to a line of cases holding that the State does not have a duty to preserve blood "samples taken for the limited purpose of determining the defendant's blood-alcohol level." *State v. Jordan,* 325 S.W.3d 1, 82 (Tenn. 2010) (appendix). In *State v. Gilbert*, the defendant requested his blood sample to conduct further testing to challenge the blood alcohol test conducted by the State. *State v. Gilbert*, 751 S.W.2d 454, 460 (Tenn. Crim. App. 1988). This court concluded that when a sample was taken for the limited purpose of testing alcohol content, the State was not required to preserve

-8-

it.  *Id.* at 461.  The court observed that "such evidence would not be expected to play a significant role in the accused's defense."  *Id.*

In *State v. Leath*, the defendant sought to establish that the victim's death was suicide, but the State presented testimony that narcotics in the victim's blood would have made him unable to get out of bed.  *State v. Leath*, 461 S.W.3d 73, 89 (Tenn. Crim. App. 2013).  The victim's blood and urine samples were destroyed over two years prior to the defendant's indictment.  *Id.* at 97.  This court concluded that there was no duty to preserve the samples because the evidence showed that the samples would have degraded over time and because the evidence would not have been material to preparing the defense, as there was no reason to doubt the accuracy of the initial testing.  *Id.* at 98; *see also Jordan*, 325 S.W.3d at 81-83 (appendix) (concluding that the State was not required to preserve blood samples that defendant claimed could have been pertinent to his capability of premeditation when samples were not requested for one year and the results of the TBI testing were not contested); *Margaret Laverne Riddle*, 2015 WL 9487936, at *12 (concluding that the State had no duty to preserve blood samples destroyed prior to the defendant's indictment because the defendant did not present evidence challenging the accuracy of the State's analysis and that the destroyed evidence was thus not critical to the defense); *State v. John N. Moffitt*, No. W2009-02286-CCA-R3-CD, 2010 WL 5274049, at *5 (Tenn. Crim. App. Dec. 15, 2010) (concluding that the State had no duty to preserve blood and also that the defendant's right to a fair trial was not violated when he waited until the eve of trial to request testing and there was substantial evidence of guilt); *State v. Gary C. Bullington*, No. M2005-02227-CCA-R3-CD, 2006 WL 1816325, at *4-5 (Tenn. Crim. App. June 27, 2006) (concluding that the State was not under a duty to preserve the blood sample which the defendant claimed belonged to another defendant, because the sample, which tested above the legal limit for alcohol, had no evident exculpatory value, and also concluding that the defendant's right to a fair trial was not violated when he waited fourteen months to request the sample, there was no indication of tampering, and other evidence supported intoxication).

The Defendant distinguishes these cases by noting that they are generally limited to a defendant asking for a second test to confirm TBI results that were not seriously disputed.  She also argues that the case at bar is distinguishable because the State was on notice that the Defendant may have been under the influence of prescription Ambien from the time of her arrest, because the drug test was requested by law enforcement but not performed, and because the exculpatory value of the drug test should have been apparent.

The State contends that the blood did not have exculpatory value because the presence of Ambien would not negate an element of the crime, and that the State was therefore not under a duty to preserve it.  In *State v. Ricky Hill Krantz*, the defendant

-9-

alleged that the indictment should have been dismissed because the State failed to preserve his blood sample and because a showing that he was intoxicated could have negated his capacity for premeditation. *State v. Ricky Hill Krantz*, No. M1999-02437-CCA-RM-CD, 2000 WL 59915, at *8 (Tenn. Crim. App. Jan. 25, 2000). This court noted that voluntary intoxication, while not a defense, can negate a culpable mental state. *Id.* at *9 (citing T.C.A. § 39-11-503(a)). The court held that the State did have a duty to preserve the sample because it might be expected to play a significant role in the defense. *Id.* at *10. We nevertheless denied relief because an analysis under *Ferguson* showed that the right to a fair trial was not violated, as the loss was due to simple negligence, there was other evidence regarding the defendant's state of inebriation, and proof of guilt was strong. *Id.* at *10-11.

The State relies primarily on *State v. Donald Bradford Slagle, Jr.* for the proposition that the presence of Ambien in the Defendant's blood would not in any event be exculpatory. In *Donald Bradford Slagle, Jr.*, the defendant was stopped by police and acknowledged that he had consumed both alcohol and "medication." *State v. Donald Bradford Slagle, Jr.*, No. E2005-02882-CCA-R3-CD, 2006 WL 2771059, at *1 (Tenn. Crim. App. Sept. 27, 2006). On appeal, he argued that the evidence showed he had not committed any voluntary act in driving because he was under the influence of Ambien, which caused him to do things he could not recall. *Id.* at *2. This court rejected the argument, noting that it "obscures the distinction between a voluntary act and mental culpability" because "the proof requires only that the Appellant chose to drive and that this choice was the product of effort or determination, not that the Appellant intended to act unlawfully." *Id.* at *4. In its analysis, the court noted that the defendant's impairment "did not stem solely from the medication Ambien," and that accepting the defendant's argument would mean "that the voluntary use of such drug would produce an absolute defense in all DUI prosecutions." *Id.* The Defendant distinguishes this case based on the fact that in *Donald Bradford Slagle, Jr.*, the defendant's medical expert could offer no opinion that the memory loss was based on the defendant's use of Ambien because the defendant was also being treated for alcohol dependency and taking other medication, all of which could cause "blackouts." *Id.*; *see also State v. Donald Bradford Slagle, Jr.*, No. E2005-02884-CCA-R3-CD, 2006 WL 3017872, at *5 (Tenn. Crim. App. Oct. 24, 2006) (holding that defendant's expert did not testify as to medical opinion that defendant was acting unconsciously and that jury could have chosen to believe that the defendant experienced an alcoholic blackout).

While intoxication is not a defense to prosecution, it may be admissible to negate a culpable mental state. T.C.A. § 39-11-503(a). Furthermore, "involuntary intoxication is a defense to prosecution if, as a result of the involuntary intoxication, the person lacked substantial capacity either to appreciate the wrongfulness of the person's conduct or to conform that conduct to the requirements of the law allegedly violated." T.C.A. § 39-11-

503(c). However, in *State v. Kain*, this court rejected the argument that "intoxication resulting from the voluntary ingesting of alcohol and prescription drugs is 'involuntary,' so as to constitute a defense." *State v. Kain*, 24 S.W.3d 816, 819 (Tenn. Crim. App. 2000). Instead, this court concluded that "a defendant whose intoxication results from knowingly ingesting a prescription drug and alcohol cannot avail himself of the involuntary intoxication defense." *Id.* We note further that DUI is a strict liability offense. *State v. Turner*, 953 S.W.2d 213, 215 (Tenn. Crim. App. 1996). Accordingly, there is no mental state which proof of intoxication could negate. *Cf. Ricky Hill Krantz*, 2000 WL 59915, at *9.

However, criminal liability requires the performance of a voluntary act. *Id.* at 216. "A voluntary act is a bodily movement performed consciously as a result of effort or determination." *Id.*; *see State v. Jonathan C. Carr*, No. M2007-01759-CCA-R3-CD, 2008 WL 4368240, at *4-5 (Tenn. Crim. App. Sept. 26, 2008) (holding that defendant who was taken to jail by force nevertheless committed a voluntary act in bringing drugs into the jail). While the Defendant contends that her act of driving was not a voluntary act because she cannot recall making the decision to drive, caselaw suggests that the voluntary act analysis is affected by the fact that her impairment "did not stem solely from the medication Ambien." *Slagle*, 2006 WL 2771059, at *4. Here, the evidence showed that the Defendant, after consuming three or four tequila-based drinks, took prescription Ambien, and ultimately drove under significant impairment. Her expert witness stated that there had been a lawsuit which resulted in a labeling change in the drug to alert consumers that it should not be combined with alcohol. As the *Slagle* court noted, there are significant policy reasons to prevent the voluntary use of such intoxicants from presenting "an absolute defense in all DUI prosecutions." *Id.* Accordingly, the Defendant, who chose to take prescription medication with several alcoholic drinks, cannot now claim that her subsequent acts were completely involuntary. The Defendant has not shown that the destroyed evidence would have been material to the preparation of her defense or "might have led the jury to entertain a reasonable doubt about [her] guilt." *See Ferguson*, 2 S.W.3d at 918.

We conclude that, under the circumstances of this case, the State did not have a duty to preserve the blood past the date it was destroyed. The presence of prescription Ambien in the Defendant's blood was not apparently exculpatory. It would not have been relevant to negating any mental state, both because the offense is a strict liability offense and because "a defendant whose intoxication results from knowingly ingesting a prescription drug and alcohol cannot avail himself of the involuntary intoxication defense." *Kain*, 24 S.W.3d at 819. Neither can the Defendant, who voluntarily ingested alcohol and Ambien, claim that her subsequent actions were involuntary. Furthermore, it is apparent that blood cannot be preserved indefinitely. *Jordan*, 325 S.W.3d at 82 (appendix). The blood sample was preserved for over one year, and the Defendant failed

in the obligation "to conduct expedient investigations and to secure relevant, material evidence whenever possible." *Michael Orlando Freeman*, 2016 WL 912160, at \*14. Other evidence, such as testimony regarding the consumption of Ambien, remains available to the Defendant.

We note that the facts as presented here established that the exculpatory value of the sample was affected by the circumstances surrounding the ingestion of the drug; that the Defendant was on notice regarding the possible destruction well before the evidence was destroyed; and that the Defendant did not introduce any proof regarding the viability of the sample at the time of its destruction, while the State introduced scant evidence leading to the inference that the sample was of limited viability. Accordingly, we do not address the contours of any duty to preserve a blood sample outside the facts of this case; we merely conclude that under these circumstances, any constitutional duty to preserve the sample was not violated.

## CONCLUSION

Because the destruction of the blood sample did not violate the Defendant's due process rights, we reverse the dismissal of the charges and remand for reinstatement of the indictment and further proceedings consistent with this opinion.

_____
JOHN EVERETT WILLIAMS, JUDGE